# McGuire Gardner P.L.L.C.
Pernell W. McGuire (SBN 015909)
320 N. Leroux
Flagstaff, AZ 86001
Telephone: (928) 779-1173
Facsimile: (928) 779-1175
pmcguire@mcguiregarnder.com
Attorneys for Michael and Divera Hamilton

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE<br><br>MICHAEL AND DIVERA HAMILTON | **Case No. 08-00531-RTBP**<br><br>Chapter 11<br><br>**SECOND AMENDED DISCLOSURE STATEMENT** |

I.          INTRODUCTION TO DISCLOSURE STATEMENT

    1.1     Purpose of This Disclosure Statement.

    This Disclosure Statement has been approved by order of the Bankruptcy Court, dated _____ as containing information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of claims against or interests in the debtor to make an informed judgment about the Debtor's Plan. The Court's approval of this Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan. The purpose of this Disclosure Statement is to provide the holders of claims against the debtors with

adequate information about the debtors and the Plan to make an informed judgment about the merits of approving the Plan.

    1.2    <u>The Debtor's Plan</u>.

**THE DEBTOR'S PLAN ACCOMPANIES THIS DISCLOSURE STATEMENT AS EXHIBIT A. THE READER IS URGED TO REVIEW THE DEBTOR'S PLAN CAREFULLY IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT. IF THERE IS ANY CONFLICT BETWEEN THE PROVISIONS OF THIS DISCLOSURE STATEMENT AND THOSE OF THE DEBTOR'S PLAN, THE PROVISIONS OF THE PLAN SHALL CONTROL.**

    1.3    <u>The Voting Process and Deadline</u>.

    A ballot accompanies this Disclosure Statement for use in voting on the Debtor's Plan. **To vote to accept or to reject the Plan, creditors and interest holders of the Debtor in any of the impaired classes should indicate their acceptance or rejection of the Plan and otherwise complete the Ballot which pertains to the Plan.** See the "Summary of Plan" contained herein and the Classification and Treatment of Claims and Interests" contained in the copy of the Plan attached hereto to determine whether you are a member of an impaired class. **Any creditor or equity holder holding claims in more than one impaired class must file separate Ballots for each such class.** Additional Ballots may be obtained by written request to the Debtor's lawyer, Pernell McGuire of McGuire Gardner, PLLC, 320 N. Leroux, Flagstaff, AZ 86001. (928) 779-1173..



2

You are urged to fill in, date, sign and promptly process your Ballot or Ballots. **Please be sure to properly complete the form and to legibly identify the name of the claimant or interest holder.** The holders of claims and interests may vote on the Plan by filling out and filing the accompanying Ballot for Accepting or Rejecting the Debtor's Plan with:

> Clerk of the U.S. Bankruptcy Court
> 230 N. First Ave, Suite 101
> Phoenix, AZ 85003

with a copy mailed to:

> McGuire Gardner, P.L.L.C.
> Attn: Pernell McGuire
> 320 N. Leroux
> Flagstaff, AZ 86001

**SIGNED AND COMPLETED BALLOTS MUST BE RECEIVED AND FILED, NOT MERELY MAILED, ON OR BEFORE 4:00 P.M. ON _____ _____** SINCE MAIL DELAYS MAY OCCUR, IT IS IMPORTANT THAT THE BALLOT OR BALLOTS BE MAILED OR DELIVERED WELL IN ADVANCE OF THE DATE SPECIFIED. ANY BALLOTS RECEIVED OR FILED AFTER THAT DATE MAY BE EXCLUDED FROM THE CALCULATION TO DETERMINE WHETHER THE CREDITORS AND INTEREST HOLDERS OF A PARTICULAR CLASS HAVE VOTED TO ACCEPT OR TO REJECT THE DEBTOR'S PLAN.

1.4     The Importance of Your Vote

As a creditor or interest holder your vote is important. The Plan can be confirmed by the Court if it is accepted by the holders of *two-thirds in amount* and more than

*one-half in number* of claims in each impaired class of claims voting on the Plan, and if it is accepted by the holders of two-thirds in amount of interests in each impaired class of equity interests voting on the Plan. In the event the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if the Court finds that it accords fair and equitable treatment to the class or classes rejecting it.

    1.5    <u>The Confirmation Process</u>

After the votes are tallied, the Court will hold a hearing on the confirmation of the Plan and may enter a Confirmation Order if it finds that the requirements for confirmation have been met.

If the required acceptance of one or more impaired classes of claims or interests is not obtained, § 1129(b)(1) of the Bankruptcy Code nevertheless permits the Bankruptcy Court to confirm the Plan upon request of the Debtor, if the Court finds that the Plan does not discriminate unfairly against and accords fair and equitable treatment to the impaired class or classes rejecting it and that the Plan otherwise meets the requirements for confirmation.

At the hearing on confirmation of the Plan, the Bankruptcy Court will hear any timely filed objections from a party in interest to confirmation of the Plan.

    1.6    <u>Confirmation Hearing</u>

**The Bankruptcy Court has set _____, 2009, at ____o'clock _____.m for a hearing on confirmation of the Debtor's Plan.**

## 1.7 Binding Effect of Plan

If the Court confirms the Plan, each creditor will be bound by the terms of and the treatment set forth in the Plan.

## II. DEFINITIONS

1. Defined Terms. In addition to any terms defined elsewhere in the Disclosure Statement or Plan the following terms have the indicated meanings:

Allowed Claim. A claim that (i) is liquidated and has been scheduled as undisputed, or (ii) for which a proof of claim has been filed that has not been objected to or that has been objected to but has been allowed by the Court.

Allowed Interest. An interest that (i) has been scheduled as undisputed, or (ii) for which a proof in interest has been filed that has not been objected to or that has been objected to but has been allowed by the Court.

Bankruptcy Code. Title 11 of the United States Code.

Bankruptcy Court. The United State Bankruptcy Court for the District of Arizona.

Confirmation Date. The date on which the Court enters the Confirmation Order.

Confirmation Order. The order of the Court confirming the Plan.

Debtors. Michael and Divera Hamilton

Distribution. The cash to be distributed under the Plan to the holder of Allowed Claims and Allowed Interests.

Disbursing Agent. The Debtor, or any other entity designated by the Debtor to act in such capacity.

Effective Date. The first business day following the date upon which the Confirmation Order has become final and non-appealable with no appeal then pending, except that the Debtor will have the right to treat this date as



having occurred under any circumstances which would moot any such appeal.

Insider.  Any person or entity defined as an insider in Section 101 of the Bankruptcy Code.

Plan.  The Debtor's Plan of Reorganization, together with any modifications thereto as may be filed by the proponent of the Plan.

Pro-Rata.  Proportionately so that the ratio of the amount of consideration distributed on account of an Allowed Claim in a particular class to the amount of consideration distributed on all Allowed Claims in the same class, is the same as the ratio of the amount of that Allowed Claim to all Allowed Claims in the same class.

Reorganized Debtor.  The Debtor following confirmation, as reorganized by this Plan.

2.  Undefined Terms.  A term used but not defined herein, but that is defined in the Bankruptcy Code, has the meaning given to that term in the Bankruptcy Code.

A term used but not defined herein, but that is defined in the Bankruptcy Code, has the meaning given to that term in the Bankruptcy Code.

III.  HISTORY AND EVENTS LEADING TO THE CHAPTER 11 FILING

3.1  Events Precipitating this Case.

In 2002 Michael and Divera Hamilton were guided to the approximately 70 acres of real property in Sedona, Arizona (the "Property") where they started their dream project to contribute to the well being of mankind. The Property is divided up into 21 parcels.  On December 12, 2003, the Hamiltons formed Angel Valley Ministries (the "Ministry"), a non-profit 501(c)(3), as the legal mechanism for their activities. The ministry uses the Property as a spiritual retreat and rents out its facilities

to various groups and individuals. A more detailed explanation of the background, vision, purpose and progress of the Ministry is attached hereto as Exhibit B.

To finance both the purchase of the Property and the preparation of the facilities, the Hamiltons brought in their private money and, as the work progressed they financed the Property improvements with mortgages in their personal name. Both the amount required to renovate and build the facilities on the Property and the time it took to establish the retreat center to be self-supporting was underestimated. However, the value of the Property gave the Hamiltons the confidence that the investments were prudent.

In mid 2007 the Hamilton's realized that borrowing money on behalf of the Ministries/Retreat Center was no longer beneficial for anyone. It was time for the Ministries/Retreat Center to stand on its own and to increase revenues through hosting more Individual and Group Retreats. The Hamiltons also began exploring ways for Angel Valley Ministries to purchase the property through donations, fundraising and investors. The Hamiltons attempted to sell part of the 70 acres, in the hope that a sale would provide enough cash to restructure the financing. However, the real estate market came to a halt during 2007.

Although the Hamiltons got behind on their mortgage payments, at the same time Angel Valley Spiritual Retreat Center was beginning to gain the financial stability they had expected to see a few years earlier. Therefore, rather than giving up on the project, the Hamiltons decided to file for protection under the Bankruptcy Code.

Angel Valley is now poised to enjoy its best year ever in terms of revenues. The Hamiltons believe that beginning in July, 2009, they will begin receiving rent payments that are sufficient to enable them to meet their obligations under their proposed plan of reorganization. In the meantime, all other options, such as selling off certain of the parcels of the Property, and finding other funding, will also be pursued.

3.2 <u>Actions Taken by Debtor Post-Petition</u>.

At this point, the Hamiltons sole source of income is from the Ministry. Thus, the Hamiltons continue to focus on improving the financial capability of the Ministry. Since the filing of the case, the Hamiltons have been involved in the restructuring of the Ministry's Board of Directors, reducing the Ministry's overhead and increasing its occupancy. The current officers and directors of the Ministry are:

Michael Hamilton, President
13513 Angel Valley Road
Sedona AZ 86336

Divera Hamilton, Secretary
13513 Angel Valley Road
Sedona, AZ 86336

Suellen Trumbour-Cheney, Vice President
Rancho Sedona
135 Bear Wallow Lane
Sedona, AZ 86336

Lynn L. Groff, Treasurer
2321 Sol Y Luz
Santa Fe, NM 87505

Thomas Allen, Vice President

P.O. Box 3352
Sedona, AZ 86340

### 3.3 Litigation.

The Hamiltons are not parties to any litigation.

### 3.4 Retention of Professionals.

The debtor has applied to the Court for approval of the employment of the following professionals:

The Law Office of Pernell W. McGuire, PLLC ("PWM") has applied to act as the attorney for the estate. An order approving Mr. McGuire was entered by the Court on June 23, 2008 . On February 1, 2009, Pernell McGuire formed McGuire Gardner, PLLC, who will continue to represent the estate. The Hamiltons have retained H & H Accounting and Business Services as accountants for the estate, and the Court has approved their retention.

### FINANCIAL INFORMATION

### 4.1 Assets.

The Debtor has assets consisting of real and personal property. The debtors property is listed in Schedules A and B of its Schedules and amended schedules a copy of which is attached hereto as Exhibit C.

### 4.2 Claims.

Claims against the debtors are set forth in Schedules D, E, and F to the Debtor's Schedules a copy of which is attached as Exhibit D.

**FOR PURPOSES OF PLAN COMPUTATION, ALL OBLIGATIONS OF THE VARIOUS CREDITORS LISTED IN THE SCHEDULES IN THIS DISCLOSURE STATEMENT AND PLAN SHOULD BE CONSIDERED AS ESTIMATES ONLY AND ALL CLAIMS ARE CONSIDERED DISPUTED AS TO THE AMOUNT UNLESS SUPPORTED BY A TIMELY FILED PROOF OF CLAIM (AND IF OBJECTION THERETO IS FILED BY DEBTOR FOLLOWING RESOLUTION BY THE BANKRUPTCY COURT AS TO AMOUNT OF THE CLAIM), OR IF THE CLAIM HAS BEEN SCHEDULED AS UNDISPUTED, FIXED AND LIQUIDATED.  ALL CREDITORS' CLAIMS NOT SUPPORTED BY TIMELY FILED PROOF OF CLAIM OR SCHEDULED AS UNDISPUTED, FIXED AND LIQUIDATED, MAY BE EXCLUDED FROM PLAN COMPUTATIONS AND DISTRIBUTIONS UNDER THE PLAN OR AT DEBTOR'S OPTION, INCLUDED AT THE AMOUNTS OR VALUES LISTED HEREIN.**

V.      <u>SUMMARY OF PLAN</u>

The following description of the plan is for informational purposes only and does not purport to change or supersede any of the specific contractual language of the plan. THE PLAN IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE CONTENTS OF THE PLAN AND THE CONTENTS OF THIS DISCLOSURE STATEMENT.

5.1     Classification and Treatment of Claims

The plan divides Claims against the Debtor into classes which the Debtor believes are in compliance with the Bankruptcy Code.  Their classification and treatment are as follows:

5.1.1   Class 1: Priority Claims.  Class 1 claims will consist of all claims which are allowed claims pursuant to Bankruptcy Code § 507(a)(1), including, without limitation, the Allowed Claims of the Debtor's professionals, any other professionals approved by the Court, any quarterly fees payable to the United States Trustee, and other claims of creditors holding Administrative Claims, including taxes.

5.1.2   Class 2: Secured Claims.  Class 2 claims will consist of the Allowed Secured Claims of M & I Bank and are designated as follows:

5.1.2.1 Class 2A consists of the secured claim in the principal amount of $940,000.00, and secured by an interest in parcels  407-25-001V, 407-25-007J, 407-25-007L, and 407-25-007M.

5.1.2.2 Class 2B consists of the secured claim in the principal amount of $238,000 and secured by an interest in parcel number 407-25-001S.

5.1.2.3 Class 2C consists of the secured claim in the principal amount of $141,000 and secured by an interest in parcel number 407-25-001X.

5.1.2.4 Class 2D consists of the secured claim in the principal amount of $270,000, and secured by an interest in parcel number 407-25-007B

5.1.2.5 Class 2E consists of the secured claim in the principal amount of $110,000.00, and secured by an interest in parcel number 407-25-007F.

5.1.2.6 Class 2F consists of the secured claim in the principal amount of

$108,000, and secured by an interest in parcel number 407-25-007N.

5.1.2.7 Class 2G consists of the secured claim in the principal amount of $300,000.00, and secured by an interest in parcel number 407-25-007V

5.1.3    Class 3: Secured Claim.  The Class 3 claims will consist of the

Allowed Secured Claims of National Bank of Arizona and are designated as follows:

5.1.3.1 Class 3A consists of the secured claim in the principal amount of $459,500.00, and secured by an interest in parcel number 407-25-009A.

5.1.3.2 Class 3B consists of the secured claim in the principal amount of $235,000.00, and secured by an interest in parcel number 407-25-007H.

5.1.3.3 Class 3C consists of the secured claim in the principal amount of $718,835.00, and secured by an interest in parcel numbers 407-25-010, 407-25-010H, and 407-25-10D.

5.1.4    Class 4 Secured Claim  Class 4 consists of the secured claim of

Avelo Mortgage, LLC in the principal amount of $520,000.00 secured by an interest in

parcel number 407-25-002K.

5.1.5. Class 5 Secured Claim  Class 5 consists of the secured claim of

IndyMac in the principal amount of $312,000.00 and secured by an interest in parcel

number 407-25-007W.

5.1.6. Class 6 Secured Claim. Class 6 consists of the secured claim of

Washington Mutual in the principal amount of $376,500.00 and secured by an interest in

parcel number 407-25-001M.

5.1.7 <u>Class 7 Secured Claim</u>  Class 7 consists of the secured claim of GMAC Mortgage in the principal amount of $544,500.00 and secured by an interest in parcel 407-25-009B

5.1.8 <u>Class 8 Secured Claim</u>  Class 8  consists of the secured claim of Liquidation Properties, Inc. aka Option One Mortgage in the principal amount of $357,000.00 and secured by an interest in parcel 407-25-010B.

5.1.9 <u>Class 9 Secured Claim</u>  Class 9 consists of the secured claim of Yavapai County in the principal amount of $11,117.60 and secured by an interest in various of the debtors' real property.

5.1.10 <u>Class 10 Priority Unsecured Claim</u>.  Class 10 consists of the priority unsecured claim of the Internal Revenue Service.

5.1.11 <u>Class 11 Priority Unsecured Claim</u>.  Class 11 consists of the priority unsecured claim of the Arizona Department of Revenue.

5.1.12  <u>Class 12: General Unsecured Claims</u>.  Class 12 will consist of all Allowed Unsecured Claims.  The following represents creditors who have filed proofs of claim with the Court, as well as the undersecured portion of certain creditors holding liens on the debtors' real property:

| Name of Creditor | Amount |
| --- | --- |
| American Express | 9,736.14 |
| AZ  First Heating and Cooling | 13,461.44 |
| Bank of America | 26,975.85 |
| Citibank (home depot) | 20,241.37 |
| Citibank | 17,235.80 |



| Citibank | 16,015.64 |
|---|---|
| Citibank (home depot) | 7,026.92 |
| Discover Bank | 5,140.46 |
| FIA Card Services | 54,546.57 |
| First Equity Card | 12,046.28 |
| Goodson Manley | 1,010.00 |
| PBK Construction | 8,829.15 |
| RSC Equipment Rentals | 19,787.51 |
| Wells Fargo Bank | 4,918.60 |
| Deficiency Claim of M & I Bank | $944,060.00 |
| Deficiency Claim of National Bank of Arizona | $554,231.00 |
| Deficiency Claim of IndyMac Bank | $128,000.00 |
| Deficiency Claim of Washington Mutual | $203,500.00 |
| Deficiency Claim of GMAC Mortgage | $105,500.00 |
| Deficiency Claim of Liquidation Properties, Inc. | $275,000.00 |
| Deficiency Claim of Feliks Mlynarczyk | $520,000.00 |
| Deficiency Claim of Bank of America | $132,507.00 |
| Deficiency Claim of Option One Mortgage | $353,521.00 |

Classes 2 through 12 are impaired.

5.2     Operation of Plan.

Unless otherwise stated, the Debtor intends to enter into a lease agreement with the Ministry and use the proceeds from repayment of amounts owed by the Ministry to repay all secured claims in full according to a graduated repayment schedule.  A copy of the proposed lease agreement is attached hereto as Exhibit E.   In short, the debtors propose to lease the 70 acre retreat to Angel Valley for the monthly amount of $20,000.00 (triple net) for the first 12 months, with payments to commence thirty (30) days from the Effective Date of the chapter 11 plan, and with payments increasing to $25,000.00 for the following 12 months, and with payment increasing to $ 35,000.00 for

the duration of the lease thereafter. The debtors propose to repay classes 2 through 12 in accordance with the following schedule.

On or before the Confirmation Date, the debtors shall execute a new adjustable rate promissory note (the "New Notes") in favor of each of the class 2 through 8 claim holders repayable in accordance with the following terms and conditions:

1. Interest only payments shall begin 30 days following the first of the month following the Confirmation Date (the "Initial Payment Date"), at an interest rate of 4% on the principal balance for a period of Twelve Months.
2. Twelve months after the Initial Payment Date, the interest rate and payment on the Principal Balance shall be adjusted to 5%, with interest only payments for 12 months.
3. Twenty-four months after the Initial Payment Date, the debtor shall make payments on the Principal Balance based on a 30 Year fully amortized payment of interest (at 5% per annum) and principal.

All other terms of the parties' original notes shall remain in effect, and each secured creditor shall retain its security interest in the debtors' property until the New Notes are satisfied in accordance with the Plan.

5.3    Basis for Calculation of Secured Claims

The Allowed Secured Claim of Classes 2A through 2G were determined in accordance with 11 U.S.C. § 506(b). The amount of the secured claim in each class was established by the appraisal of Ralph Brekan.

The Allowed Secured Claims of Classes 3 – 8 were determined in accordance with 11 U.S.C. § 506(b). The amount of each of these claims was determined in accordance with a Broker's Price Opinion obtained for each parcel securing the respective class holder's claim. A copy of each of the BPOs is attached to the disclosure statement at Exhibit F.

A.   Treatment of Class 1

Administrative claims pursuant to 11 U.S.C. § 503(b) including but not limited to pre-confirmation attorney's fees approved by the Court, U.S. Trustee expense, expenses of the U.S. Bankruptcy Clerk, and pre-confirmation administrative taxes, if any, shall be paid in full upon the Effective Date unless otherwise agreed in writing with said creditor. The U.S. Trustee fees shall be paid in full as of the Effective Date of the Plan, and shall continue to be paid until the case is closed.

B   Treatment of Classes 2 - 8

As set forth above, the debtors propose to repay the class 2 through class 8 claims by entering into one of the New Notes.  Class 5, IndyMac has already agreed to this treatment under the Plan.  For illustration purposes, the Class 2A claim with a principal balance of $940,000.00 would receive monthly payments in accordance with the following schedule:



| Month | Payment |
|---|---|
| 1-12 | 3,133.33 |
| Months 13-24 | 3,916.67 |
| Months 25-360 | 5,046.12 |

Debtors propose to repay each of the New Notes in similar fashion.  The following table represents the monthly payments due to each of the secured creditors:

| Class | Months 1-12 | Months 13-24 | Months 25-360 |
|---|---|---|---|
| 2A | 3,133.33 | 3,916.67 | 5,046.12 |
| 2B | 793.33 | 991.66 | 1,277.64 |
| 2C | 470.00 | 587.50 | 756.92 |
| 2D | 900.00 | 1,125.00 | 1,449.42 |
| 2E | 366.67 | 458.33 | 590.50 |

| | | | |
|---|---|---|---|
| 2F | 360.00 | 450.00 | 579.77 |
| 2G | 1,000.00 | 1,250.00 | 1,610.46 |
| 3A | 1,531.66 | 1,914.58 | 2,466.70 |
| 3B | 783.33 | 979.17 | 1,261.53 |
| 3C | 2,396.11 | 2,995.15 | 3,858.86 |
| 4 | 1,733.33 | 2,166.67 | 2,791.47 |
| 5 | 1,040.00 | 1,300.00 | 1,674.88 |
| 6 | 1,255.00 | 1,568.75 | 2,018.45 |
| 7 | 1,815.00 | 2,268.75 | 2,922.99 |
| 8 | 1,190.00 | 1,487.50 | 1,916.45 |
| Total | 20,582.78 | 25,728.49 | 33,145.15 |

C. <u>Treatment of Class 9</u>

The debtors shall pay class 9 the principal sum of $11,117.60 with interest at the rate of 16% per annum in sixty equal installments of $149.50.

D. <u>Treatment of Class 10</u>

The debtors shall pay the Class 10 priority claim the sum of $22,323.65 in forty-two equal installments of 531.52.

E. <u>Treatment of Class 11</u>

The debtors shall pay the Class 11 priority claim the sum of $17,485.87 (or as increased or decreased through the claims objection process) in forty-two equal installments of $416.33.

F. <u>Treatment of Class 12</u>

Beginning 180 days from the Confirmation Date, the Debtors shall pay all of their projected disposable income under the plan for a five year period, the proceeds of which shall pay the Class 11 claims in accordance with the requirements of 11 U.S.C.

§ 1129(a)(9)(C).  The debtors project that their disposable income will be $500.00 each month.  A summary of the basis for the debtors' calculation of projected disposable income is attached hereto as Exhibit G.

G.     The holder of any claim to which an objection has been made prior to or on the date on which the first payment to the holder of such a claim is made, shall not be entitled to receive any distribution otherwise attributable to that claim until the objection has been resolved by order of the Court.  Any distribution which would otherwise accrue to the benefit of the holder of an Allowed Claim prior to resolution of an objection shall be held by the Debtor in a segregated account and upon resolution of the objection either paid to the claimholder or returned to the estate, as appropriate, in light of the Court's resolution of the objection.  In the event a claim is reduced voluntarily by the claimholder or by ruling of the Court following objection by the Debtor or any other party in interest, the Debtor may at its option continue to make payments in the monthly amounts specified in this Disclosure Statement and the Plan of Reorganization until the reduced claimholder has received all amounts to which it is entitled, or alternatively, reduce the monthly amount payable on behalf of the reduced claim (and all claims of the same class) so that the claims are paid within the time specified in the Disclosure Statement and Plan of Reorganization.  This option to decrease the monthly payment but pay for the full term specified in the Plan or maintain the monthly payment and reduce the term over which such payments must be paid, shall be within in the sole discretion of the Debtor and the exercise of his reasonable business judgment.

H.     At any time during the duration of this Plan, the Debtor reserves the right to sell all or any part of his property interests provided the remaining assets and/or the value received upon sale permits the full distributions required by the Plan.  In such event, the Reorganized Debtor will retain any surplus funds following distribution in full to eligible classes.



I.     All undisputed taxes generated by any step of the operation of this Plan, or accruing during the operation of this Plan, will be considered administrative expenses to be satisfied as they accrue.

**THE DEBTOR BELIEVES THAT THE PLAN DESCRIBED HEREIN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS.  THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EACH AND EVERY CLASS OF CREDITOR AND INTEREST HOLDER, AND RECOMMENDS THAT EACH CLASS VOTE TO ACCEPT THE PLAN.**

VI.    IMPLEMENTATION OF THE PLAN

6.1    <u>Projection of Operation</u>.  A projection of income and expenses upon which this Plan is based is appended hereto in Exhibit "H."  Exhibit H is a projection of the Ministries' operations for 2009 through 2013.  The economic assumptions underlying this Plan are set forth below.  All financial information reported by the Ministry is done on an accrual basis.

A.     Income.  The rationale for the increases in income over the next 5 years is based on 7 factors;

1)     the increase in income of group retreats, individual retreats and events that Angel Valley has experienced from 2005 to 2008. The gross income during this period of time has increased by 327%,

2)     the results of the previous years in marketing the Retreat Center and the word-of-mouth recognition because of good experiences are resulting into the name of the Retreat Center being more established,

3)     as of January 31, 2009, Angel Valley has booked and received payments for 25 group retreats in 2009 amounting to $417,516.00, as compared to the amount $453,877.00 for 31

19



group retreats in the entire year of 2008. More group retreats for 2009 have been booked since that date, and are being negotiated. Based on previous years there will be additional groups that book at shorter notice.

4) filling in low occupancy months with more individual guests and workshops,

5) by re-assigning and re-organizing the meeting and lodging spaces Angel Valley has increased its capacity for the number of group and individual retreats that can be hosted simultaneously,

6) the projected increase in interest in both the spiritual/metaphysical and the corporate market for persons seeking personal growth, spiritual guidance and support through individual and group retreats. The projection of gross income for 2009 is an estimated increase from 2008 of 51% and is based on actual confirmed reservations as of January 31, 2009 of $417,516, which represents a 58% increase over confirmed reservations as of January 31, 2008. In addition, reservations made after January 31, 2008, were approximately 110% of confirmed reservations as of that date. The debtors are projecting a similar pattern for 2009.

The increase for 2010 is estimated at 33%, in 2011 – 24%, in 2012 – 15%, and in 2013 – 15%. While the 2009 income is projected at 220% of 2007, which in itself is significant, this income translates into a yearly occupancy rate of 15%. This percentage leaves a substantial inventory of available space for the future.

7) The Ministry also has approximately 20% of its total income derived from sources other than group retreats. In 2008, this income was

approximately $129,000. The debtors expect this income will continue at approximately the same rate in 2009, thereby making the debtors' projection of total gross income from all sources of $885,496 extremely conservative.

B.     Net Revenue. From the projected income and expenses, it is anticipated that the net revenue from operations available to fund the Plan through lease payments can be calculated as set forth on Exhibit "H". The total available to fund the distributions would also include cash on hand at the confirmation date. For purposes of these projections, it is assumed that the first year following the Effective Date will be the balance of calendar year 2009. Each Plan year thereafter will correspond to the subsequent calendar years.

C.     Historical Financial Information. Financial statements for the ministry for the years 2005 through 2008 are attached as Exhibit I and demonstrate a clear trend of increased revenues and income over that period of time. The Ministries' certified public accountant has reviewed the financial records of the Ministry to confirm the reasonableness of the Ministries' financial information. A copy of her letter is attached as Exhibit J.

6.2     Assumptions. In addition to the economic assumptions set forth in the projections attached as Exhibits to the Disclosure Statements, there are a number of other assumptions upon which this Plan is based:

A.     It is assumed that the Debtors have, or will have, sufficient funds on hand on the Effective Date of the Plan to pay administrative expenses as reflected herein and retain an initial capital reserve so that all revenues projected may be used to make distributions to creditors.



B.     It is assumed that the Ministry will be able to achieve its target revenues based upon a continued increase in the customer base and efficiency in the Ministries' operations.

6.3     <u>Risk Factors</u>.  Just as in any business, the business in which the Ministry is engaged involved certain risks, including the following:

A.  Competition.  There can be no assurance that new competition will not enter the market, with the effect of decreasing the profit margins and/or amount of new business.

B.  Future Default.  The Debtors are obligated by the terms of the Plan to pay certain payments to the Class 2 through 8 secured creditors.    Should the Debtors fail to make those payments when due, the secured creditor would have access to state court proceedings or other non-judicial remedies to enforce its security interest.  Such default and subsequent loss of assets of the estate could have a significant adverse interest on the Debtor's ability to fund the other distributions called for in the Plan.

VII     <u>LIQUIDATION ANALYSIS</u>

In order to arrive at a judgment on whether or not to vote for or against the Plan, a creditor or other party in interest needs to have an understanding of the consequences that would be realized if the Debtor's estate were liquidated pursuant to Chapter 7 of the Bankruptcy Code.

In the instant case, it is anticipated if the Debtor's estate were liquidated and the assets sold pursuant to a Chapter 7 liquidation, the sale of the real property would be accomplished at prices less than the fair market value than if sold in a non-liquidation setting.  Even assuming that the real property could be sold at its current value, the

liquidation analysis demonstrates that there is no equity in any of the real property
available to pay claims to general unsecured creditors.

| Parcel | EXISTING LOAN BALANCES | Value of Parcel | UNDERSECURED AMOUNT |
|---|---|---|---|
| | - | - | - |
| 1 | $294,582.00 | IN TOTAL BELOW | |
| 1A | $244,622.00 | IN TOTAL BELOW | |
| 1B | $275,402.00 | IN TOTAL BELOW | |
| 1B | $200,000.00 | | |
| 1C | $305,,930.00 | IN TOTAL BELOW | |
| 1C | $180,000.00 | | |
| total | $1,500,536.00 | $940,000.00 | $560,536.00 |
| 2 | $247,509.00 | $238,000.00 | $9,509.00 |
| 3 | $359,519.00 | $235,000.00 | $124,519.00 |
| 3-A | $268,950.00 | $108,000.00 | $160,950.00 |
| 4 | $254,396.00 | $110,000.00 | $144,396.00 |
| 5 | $312,522.00 | $141,000.00 | $171,522.00 |
| 6-A | $590,711.00 | $459,500.00 | $131,211.00 |
| 6-A | $140,000.00 | | $140,000.00 |
| 6-B | $650,000.00 | $544,500.00 | $105,500.00 |
| 6B | $132,507.00 | | $132,507.00 |
| 7-A-1 | $349,976.00 | $300,000.00 | $49,976.00 |
| 7-B | $440,000.00 | $312,000.00 | $128,000.00 |
| 8 | $326,195.00 | $270,000.00 | $56,195.00 |
| 9 | $580,000.00 | $376,500.00 | $203,500.00 |
| 10 | $520,000.00 | $537,000.00 | |
| 11 | $632,000.00 | $357,000.00 | $275,000.00 |
| 11 | $78,521.00 | | $78,521.00 |

| | | | |
|---|---|---|---|
| 12 | $316,168.00 | $200,000.00 | $116,168.00 |
| 13 | $385,000.00 | $318,835.00 | $66,165.00 |
| 14 | $316,168.00 | $200,000.00 | $116,168.00 |
| Total | $8,400,678.00 | $5,647,335.00 | $2,770,343.00 |

Sample Chapter 7 Scenario

Available Assets in Chapter 7

Net Proceeds from Sale of the Real Property                    $0.00

Total Assets Available for distribution to unsecured
Creditors in Chapter 7 Liquidation                             $50,000.00

| Comparison of Percentage Recovery | Chapter 7 | Chapter 11 |
|---|---|---|
| Class 1  Administrative Fees | | |
| $10,000.00. (Chapter 7 Trustee Fees) | 100% | n/a |
| $25,000 (Attorney's Fees) | 100% | 100% |

| | Chapter 7 | Chapter 11 |
|---|---|---|
| Class 2 - 8 | | |

The debtors' plan provides for payment of all Allowed Secured Claims in amount equal to or exceeding what the claimant would receive in chapter 7 assuming that the property would sell at or below its appraised value, after deducting for costs of sale.

| | Chapter 7 | Chapter 11 |
|---|---|---|
| Class 9 | 100% | 100% |
| Class 10 | 0% | 100% |
| Class 11 | 0% | 100% |
| Class 12 | 0% | 1% |

The liquidation analysis assumes Chapter 7 trustee's fees based upon the fees recoverable under 11 U.S.C. § 326. The liquidation analysis further assumes chapter 11 attorney's fees incurred throughout the case would be paid from the chapter 7 estate. Finally, the claims for each creditor are estimates provided by the debtor. Certain of the secured and unsecured claims may be disputed.

VIII.    COMPLIANCE WITH BANKRUPTCY CODE.

In order to confirm the Plan, the Bankruptcy Court must make a series of determinations concerning the Plan, including those set forth, infra. The Debtor believes that each of these conditions has been met and will seek rulings of the Bankruptcy Court to this effect at the confirmation hearing.

In addition, the Bankruptcy Code also requires that the Plan be accepted by requisite votes of holders of claims and interest. If any member of an impaired class does not accept the Plan, the Bankruptcy Court must find that confirmation of the Plan is in the "best Interests" of such entities.

8.1    Classification of Claims and Interest. The Bankruptcy Code requires that a plan of reorganization place each creditor's claim and each holder of an interest in a class with other claims or interest that are "substantially similar." The Debtor believes that the Plan's classification system meets the Bankruptcy Code standard.

8.2    Section 1111(b) Election. Section 1111(b) of the Bankruptcy Code provides that as a general rule, a secured claim is to be accorded a treatment in the Chapter 11 Plan that is the same as would be received if it were a recourse claim,

regardless of whether or not the claim is non-recourse by agreement or applicable law. Section 1111 also provides an opportunity for a partially secured creditor whose claim is treated by the proposed Plan of Reorganization as partially secured and partially unsecured to acquiesce in such bifurcation of their claim or, alternatively, to elect to treat the claim as fully secured. In this case, Debtors have not treated any creditor as partially secured.

8.3    Technical Requirements.  To be confirmed, the contents of a plan must comply with the technical requirements of Chapter 11 of the Bankruptcy Code, which the Debtor believes to have been done.

8.4    Good Faith.  To be confirmed the Bankruptcy Court must find that the Debtor has proposed the Plan in good faith.  In the instant case that requirement is met, since the Plan contemplates a bona fide reorganization in which the creditors will be paid an amount on behalf of their claims that is greater than would be received through liquidation or conversion to a Chapter 7 proceeding.

8.5    Disclosure.  The Bankruptcy Court must find that the Debtor's disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the bankruptcy case, as well as the identity, affiliations and compensation to be paid to all officers, directors and other insiders.  The Debtor believes this requirement to have been met by the Disclosure Statement.

8.6 <u>Feasibility</u>. The Plan may not be confirmed if the Bankruptcy Court finds that confirmation is likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization. The Debtor believes that it will be able to perform its obligations under the Plan and continue to operate its business without further reorganization, all as set forth herein.

8.7 <u>Best Interests</u>. Notwithstanding acceptance of the Plan by creditors and interest holders impaired under the Plan, if a claimant or interest holder does not accept the Plan, then the Bankruptcy Court must independently determine that the Plan is in the best interests of that claimant's or interest holder's class. To meet this test, the Bankruptcy Court must determine that each claim or interest in the impaired class will receive under the Plan, as of the Effective Date, property of a value at least equal to the value that each such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. A liquidation analysis is contained in Section VII of this Plan, from which it can be seen that the foregoing condition is met.

IX. <u>TAX CONSEQUENCES OF PLAN</u>

In 1978, a massive revision of the bankruptcy laws was enacted as the Bankruptcy Code now in effect. In turn, the impact of the Bankruptcy Code on the existing tax laws led to the enactment of the Bankruptcy Tax Act of 1980, P.L. 96-589, 94 Stat. 3389 (1980). this Act made a number of significant changes in the law, relating inter alia, to how the bankruptcy estate is taxed, whether the occurrence of the bankruptcy will

interrupt the Debtor's taxable year, whether income and deductions belong to the Debtor or the estate, and whether individual losses are available to the estate.

**CLAIMANTS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS CONCERNING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED IN THIS PLAN, INCLUDING STATE AND LOCAL TAX CONSEQUENCES.**

X.      VOTING/CONFIRMATION/ALTERNATIVES

10.1    Voting.  A creditor may vote either to accept the Plan or to reject the Plan. Only the votes of impaired classes will be counted in connection with confirmation of the Plan, since classes of claims and interests which are not impaired are deemed to have accepted the Plan.  In determining acceptance of the Plan, votes will be counted only if submitted by a party with an Allowed claim or an Allowed Interest, and the ballot for voting on the Plan does not constitute a proof of claim for this purpose.  A claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court has ruled on the objection, and although holders of disputed claims will receive ballots, these votes will not be counted unless the Bankruptcy Court temporarily allows such claim for purposes of voting on the Plan.

10.2    Confirmation.  In order for the Plan to be approved, it must either (i) be accepted by at least two-third in amount and more than one-half in number of the creditors of each impaired class, or (ii) be approved by the Court as being in the best

interest of all parties in spite of failure to receive the required votes of creditors in any particular class (i.e. "cram-down").

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims of that class, counting only those members of the class who actually vote. The Bankruptcy Code defines acceptance of a plan by a class of interests (equity securities) as acceptance by two-thirds of the number of shares, counting only those shares actually voted.

Classes of claims and interests that are unimpaired under the Plan are conclusively deemed to have accepted the Plan. A class of creditors or interest holders is unimpaired if the Plan (i) does not alter the legal, equitable or contractual rights between the Debtor and the creditor or interest holder (with the exception of reinstating the claim by curing any defaults), or (ii) pays the claimant the full amount of the claim or interest by cash payment on the Effective Date. Classes of claim and interests that receive no distribution under the Plan are deemed to have rejected the Plan. Consequently, ballots are being sent only to those classes which are impaired but are to receive a distribution under the Plan.

The Plan may be confirmed by the Bankruptcy court even if it is not accepted by all classes of impaired claim, as long as at least one impaired class of claims has accepted.

10.3    <u>Alternative To Confirmation</u>. In the event this Plan is not confirmed, the Chapter 11 proceeding can be (i) continued for the submission of other plans, (ii)

converted to Chapter 7, or (iii) dismissed. In the event the Plan is not confirmed through acceptance of the claimholders, it is the Debtor's intention to seek confirmation through cram-down.

## XI.. INFORMATION/REPRESENTATIONS

11.1 <u>Source of Information</u>. Unless otherwise stated, all of the information contained herein is based on information supplied by the Debtor or its agents, and no representations concerning the Debtor are authorized by the Debtor other than as set forth in this Disclosure Statement.

11.2 <u>Conflicts</u>. To the extent any information set forth in this Disclosure Statement conflicts with any information set forth in the Debtor's schedules or statement of financial affairs, this Disclosure Statement will govern and will, to the extent necessary, constitute an amendment to the affected schedules or statement of financial affairs.

11.3 <u>Unauthorized Representations</u>. Any representations or inducements made to secure acceptance other than as contained in this Disclosure Statement should not be relied upon arriving at a decision, and such representations and inducements should be reported to counsel for Debtor, who, in turn, shall deliver such information to the Court for appropriate action.

11.4 <u>Disclaimer</u>.

**NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN. YOU SHOULD**



NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS TO ACCEPT THE PLAN OTHER THAN THOSE CONTAINED HEREIN.

AN ACCOUNTANT HAS NOT REVIEWED OR APPROVED THE INFORMATION CONTAINED HEREIN.  MUCH OF THE INFORMATION CONTAINED HEREIN WAS DERIVED FROM THE DEBTOR OR THE DEBTOR'S RECORDS AND HAS NOT BEEN VERIFIED FROM INDEPENDENT SOURCES.  THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE DEBTOR'S BEST KNOWLEDGE, INFORMATION, AND BELIEF.

THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.  THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE COURT ENDORSES OR APPROVES THE PLAN, BUT ONLY THAT IF THE INFORMATION IS ACCURATE, IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS AND INTEREST HOLDERS TO MAKE INFORMED DECISIONS WHETHER TO APPROVE OR REJECT THE PLAN.

Dated this 2<u>nd</u> day of March, 2009

**MCGUIRE GARDNER, PLLC**

<u>/s/ Pernell W. McGuire</u>
Pernell W. McGuire

<u>/s/ Michael Hamilton</u>
Michael Hamilton

<u>/s/ Divera Hamilton</u>
Divera Hamilton